## W. D. MAY v. THE STATE.

No. 17524.   Delivered May 8, 1935.
Rehearing Denied June 12, 1935.

The opinion states the case.

*Mays & Mays, Tom McMurray,* and *Arthur Lee Moore,* all of Fort Worth, for appellant.

*Will R. Parker,* Cr. Dist. Atty., and *Herbert C. Wade,* Asst. Dist. Atty., both of Fort Worth, and *Lloyd W. Davidson,* State's Atty., of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Jack Sturdivant by shooting him with a gun.

Harry Rutherford, J. B. Rutherford and deceased were last seen alive in the town of Handley about dusk on the evening of July 8, 1933. When last seen they were in an automobile

traveling in the direction of the homes of appellant and one O. D. Stevens, which were about three and one-half miles from the town of Handley. A private lane led to the homes of appellant and Stevens, Stevens' home being located on the west side of said lane and appellant's on the east side thereof. The clothes that the deceased and the Rutherford boys were wearing, together with their watches, papers and other personal belongings, were found July 9, 1933, in a branch of the Trinity River, a mile or two from the homes of appellant and Stevens. The clothes were wrapped in "hog" wire which was similar to wire found at appellant's home. They were weighted down with brown sandstone of the same character as that found at appellant's home. The bodies of the Rutherford boys and deceased were found in another branch of the Trinity River not far from where the clothes had been discovered, and within a few days after the finding of said clothes. The bodies were bound together with "hog" wire similar to the "hog" wire found at appellant's home. Said bodies were weighted down with two one-hundred-pound sacks of Lone Star cement. The evidence indicated that deceased and his companions probably had been killed between the hours of 10:35 p. m., July 8, 1933, and 1 a. m., July 9, 1933. Each of said men had been shot, it being shown that three different kinds of guns had been used in the killing.

Weldon Routt, a witness for the State, testified that approximately a month before the homicide appellant told him that there were some men at O. D. Stevens' home; that Stevens was not at home and Mrs. Stevens could not make the men leave; that appellant asked the witness to go with him to Stevens' home to see about said men; that he drove with appellant to the vicinity of the homes of appellant and Stevens; that appellant got out of the car and went on foot across the field, taking with him a pistol which he had borrowed from the witness; that a few minutes thereafter appellant returned and stated to the witness that he had gotten a glimpse of the men and that they were the parties who had participated in a mail robbery with appellant; that he (appellant) was expecting trouble with said parties because of the fact that they had not received their part of the loot. Routt testified further that said men were deceased, Harry Rutherford and J. B. Rutherford, and that he thereafter saw them on the afternoon of July 8, 1933.

Appellant was arrested on the 10th of July, 1933. There was found at his home shortly after his arrest a truck, on the floor and hub cap of which were large quantities of blood. On

appellant's belt, which the officers found at his home, there was blood. The chemist who made a laboratory test testified that it was human blood. On the evening of July 8, 1933, appellant took his family to the home of Mrs. Brown between 7 and 7:30 and left them there. He did not return for them until 2 o'clock the following morning. The wives of two of the dead men testified that deceased and the Rutherford boys left Dallas July 8, 1933, to go to Handley; that when they did not return by night the witnesses went to the May and Stevens homes; that they drove the car down the private lane leading to said homes, and parked in the entrance near Stevens' house; that while they were there they saw an automobile come through the lane and go to appellant's home. The testimony of the State was to the effect that said car was similar to the car appellant was driving when he took his family to Mrs. Brown's place. The wives of two of the dead men testified further that at a later time during said evening and somewhere in the neighborhood of 11:30 p. m., they saw a truck leave the May home and go out said lane; that said truck was practically identical in appearance with appellant's truck upon which the human blood had been found. Two witnesses for the State testified that they were at a party located some two or three hundred yards north of the homes of appellant and Stevens on the night of July 8, 1933; that they heard several shots in the direction of appellant's home. One of the witnesses testified she and a young man had stepped outside the house and while out there she heard the shots. She said that before going outside the young man looked at his watch and it was 10:30 p. m. She did not state, however, how long she had been outside when the shots were fired. Another witness for the State fixed the time at approximately 11 p. m. The testimony of the State was to the effect that the "hog" wire which contained the clothes of the three deceased men and the wire which was wrapped around their bodies was exactly like the wire found at appellant's place; that the pieces of wire had been fitted to the wire found at appellant's place; and showed that it had been cut from said wire. The testimony was to the further effect that sometime during the week preceding the day on which the homicide occurred appellant had purchased forty sacks of Lone Star cement from a certain dealer in the town of Handley and that said sacks bore certain numbers. There were found at appellant's home thirty-eight sacks of cement bearing the Lone Star brand and bearing also the same numbers as the two sacks of Lone Star cement found with the bodies of deceased and his two companions.

6

The foregoing constitutes in substance the testimony adduced by the State.

Appellant did not testify in his own behalf. He introduced two witnesses in an effort to raise the issue of alibi. W. L. Gaddis testified that he was in a filling station in the town of Handley on the evening of July 8, 1933. While he was there appellant drove up in an automobile for the purpose of having his lights fixed. We quote from the testimony of the witness as follows: "As to whether I can estimate the time when Bill May (appellant) came to Mr. Carr's filling station, will state I couldn't say what time because I didn't pay no attention to the time. As to my best judgment about it, I judge it to be around 8:30. It was beginning to get dark. Yes, sir, I talked with Bill May on that occasion. Yes, sir, we had a talk. While I was talking to Bill May Mr. Carr was working on Bill's car. He was fixing the lights. No, Mr. Carr did not join in the conversation between Mr. May and I before we entered our conversation. Mr. May left before I left. Yes, sir, he left before I left. As to what time he left will state I could not say what time he left, but I judge it must have been something like an hour and a half or two hours from the time he drove up there until he left. Yes, that is my best judgment. As to how long I stayed after Bill left, will state I don't know, possibly an hour."

C. C. Carr, the owner of the garage and filling station mentioned in the testimony of the witness Gaddis, testified on his direct-examination by appellant, in part, as follows: "Yes, sir, I saw the defendant W. D. May on that night. I saw him at my place. Walter Gaddis was there. Yes, sir, that is W. L. Gaddis. Mr. Gaddis got to my place first. As to how long he had been there before Mr. May came up, will state within thirty or forty minutes, may be longer. As to what time Mr. May came there, will state I judge about nine o'clock—8:30 or 9 o'clock. He had his lights out. Yes, sir, I worked on them. I fixed them temporarily. * * * As to how long he (appellant) stayed there after he got there before he left, will state I judge an hour and a half or more. Yes, sir, about an hour and a half or more."

On cross-examination the witness testified, in part, as follows: "Yes, sir, Bill May was in a Chevrolet coupe at my place. Yes, sir, then he started toward home. When he left my place, he turned back this way (indicating). Yes, sir, that is back toward his home. Yes, sir, that was about 9:30 or 10 o'clock when he left my place."

Lum Phifer, a witness for appellant, testified that he ran a garage which was located three miles west of the town of Handley; that he saw appellant at his garage in a Chevrolet coupe about 12 o'clock on the night of July 8, 1933.

A witness for the State testified that he heard the shots in the direction of appellant's home about 11 p. m. He said, however, that he looked at no time piece, and, in effect, that he was guessing at the time. It has already been observed that another witness for the State testified she stepped outside of the house shortly after 10:30 p. m. and that she heard the shots. She did not testify as to how long she had been outside when said shots were heard. Further, it has been observed that the filling station at Handley at which appellant was seen by his witnesses was three and one-half miles from appellant's home; that appellant was traveling in a Chevrolet coupe; that he drove toward his home when he left said filling station.

Appellant timely and properly excepted to the charge for its failure to submit an instruction on alibi. It is recited in each bill of exception found in the record that it was the State's theory that the homicide occurred between 10:35 p. m. and 1 o'clock a. m. The rule governing the necessity of a charge on alibi is stated by Mr. Branch in his Annotated Texas Penal Code, Sec. 55, as follows: "It is not necessary that defendant testify in so many words that he was in another and different place in order to raise the issue of alibi; if the evidence so shows, then the issue is raised regardless of how the statement is made. If there is testimony from any source which, if true, shows that the accused was not at the place where the offense was committed, and presence is necessary to a conviction, then the issue is raised." In support of the text several authorities are cited, among them being Conway v. State, 33 Texas Crim. Rep., 330; Padron v. State, 41 Texas Crim. Rep,, 552; Sapp v. State, 77 S. W., 456, and Davis v. State, 152 S. W., 1094. Stated in another way, the charge is not required unless the testimony relied on to establish the alibi is inconsistent with the fact of the presence of the accused at the commission of the offense. Woods v. State, 188 S. W., 980. In Williams v. State, 132 S. W., 345, the State relied upon circumstantial evidence to establish the fact that Williams killed one McGill. There was indefinite testimony in the record suggesting that on the night of the killing Williams was two miles from the scene. In concluding that there was no error in failing to charge on alibi, this court, speaking through Judge Davidson, said: "The testimony is so indefinite in regard to his absence at the time of the

homicide that the error, if any was committed by the court in
this respect, is not of sufficient importance to require us to re-
verse the judgment for that reason." In the present case the
witnesses who testified that appellant was at a filling station
three and one-half miles from the scene of the homicide looked
at no time pieces. They stated that they did not know when
appellant left the filling station. One of them expressed the
opinion that it was about 10 o'clock, while in the best judgment
of the other is was 10:30. If true, such testimony would not
show that appellant was not present when the offense was com-
mitted. See Underwood v. State, 117 S. W., 809. Under the
circumstances, we are constrained to hold that the charge was
not required.

Appellant brings forward several bills of exception in which
he complains of the action of the trial court in refusing to sub-
mit to the jury certain requested instructions. One of these
instructions would have advised the jury not to consider the
testimony pertaining to any acts or declarations of O. D. Stevens
outside of the presence of appellant. Another of such instruc-
tions would have advised the jury that they could not consider
any acts and declarations of Stevens outside of the presence and
hearing of appellant unless they believed beyond a reasonable
doubt that there was a conspiracy between appellant and
Stevens to kill deceased. No declarations on the part of
Stevens were shown. It has been observed that the State intro-
duced proof to the effect that deceased, Harry Rutherford, and
J. B. Rutherford were seen on the afternoon of July 8, 1933,
the date of the homicide, playing dominoes in the town of
Handley with O. D. Stevens, and conversing with him. The
proof did not show what was said between the parties. About
dusk of said evening Stevens got in his automobile and traveled
toward his home. He was followed by the three deceased per-
sons. The proof shows that in all probability the homicide
occurred near the homes of appellant and Stevens. Other proof
on the part of the State was to the effect that Weldon Routt
had a conversation with Stevens about a mail robbery. It was
not shown what was said by said parties. Routt testified that
appellant told him of the robbery and said he was expecting
trouble with the persons who were later killed. The location of
the homes of appellant and Stevens was shown. We think the
testimony showing the fact that Stevens was with the deceased
parties and that they followed him in the direction of his home,
and, further, the testimony showing the location of appellant's
and Stevens' homes was clearly admissible to show the place the

deceased and his companions were last seen alive, and the direction in which they were traveling before the homicide. In short, we think the testimony upon which appellant's requested instructions were predicted was relevant and admissible regardless of the establishment of a conspiracy between appellant and Stevens to kill deceased. Hence said instructions were properly refused.

Appellant filed a motion several months before the trial in which he sought an order of the trial court requiring the district attorney, chemist and doctors who made the laboratory test of the blood found on his truck to turn over to appellant and his attorneys the hub cap and pieces of the floor of the truck upon which blood was found. The motion sought to obtain information about the result of the laboratory test, as well as to obtain the hub cap and pieces of wood. The chemist testified at the trial that he made an analysis of the substances found on the hub cap and pieces of wood and that it was human blood. At the time the motion was made by appellant the district attorney informed appellant's counsel in open court that the analysis had been made by such chemist and that it showed that the substance was human blood. The truck from which the specimens were taken had been in the possession of appellant from the time of his arrest until the time of the trial. There were many other such blood stains on said truck. Thus it is seen that appellant had been advised that the substance on said truck was human blood and that the State would produce testimony to such effect upon the trial. The hub cap and pieces out of the car were produced in evidence by the State at the time of the trial. Appellant and his counsel had the opportunity to examine them. It would appear that appellant could have secured specimens from the truck and had an analysis made by chemists. Under the circumstances, we are constrained to hold that error is not shown.

Several bills of exception relate to appellant's objection to testimony of officers touching the things they found on appellant's premises after the homicide. These bills show that the officers were not armed with a search warrant. However, it is observed that appellant's wife gave her consent and permission to the officers to make the search. In the case of Cass v. State, 61 S. W. (2d) 500, it was held that permission given by the wife is sufficient, and that under such circumstances, a warrant to search is not required.

We find in the record a bill of exception bringing forward appellant's complaint of the action of the trial court in refusing

to grant his second application for a continuance. Appellant has been confined in jail since July 10, 1933. The indictment was returned July 20, 1933. Application for process for the absent witnesses was not made until December 27, 1933, which was approximately five months after the return of the indictment. We think the diligence was insufficient.

The judgment is affirmed.

*Affirmed.*

MORROW, P. J., absent.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—It is urged in the motion for rehearing that we were wrong in holding it not reversibly erroneous to refuse to charge on alibi. Appellant did not testify, nor by affirmative testimony of any witness locate himself at another and different place when the killing was done. He lived a few miles from Handley, and close to the home of one Stevens. The State's theory was that the killing was at or near appellant's place. To travel from Handley to said place in a car going approximately twenty miles per hour would take some ten minutes. If faster,—less. No one undertook to fix the exact time of the killing. Miss Works said she and Miss Hargrove went outside of Mr. Winn's house where they were that night, and while out in the yard heard the shooting up toward appellant's house. Asked if she could fix the approximate time of the shooting, she said that before they went out of the house Mr. Wright looked at his watch and it was 10:30. She was not asked how long they stayed outside, nor how long after they went out until they heard the shooting, nor how long after Mr. Wright looked at his watch before they went outside. Mr. Bush testified that he went to Winn's house about 9 p. m. He was sick and did not go into the house but stayed out in his car until past midnight. He heard the shooting. He said "No, I don't have any way of fixing the time, except guessing at it." On cross-examination he said: "I don't know how long I was down there before I heard those shots, three or three and a half hours, something like that. No, it was earlier than 12:00 or 12:30. I got there at nine,—it would be about 11:00 or 11:30. Somewhere around there." This witness said that a truck came down the lane from the direction of appellant's house, and on

cross-examination he said that this truck came about half or three-quarters of an hour after he heard the shots. "Something like 11:30." These are the witnesses, and this the testimony as to the time of the killing.

The alibi testimony is set out in our original opinion. Mr. Gaddis swore that his best judgment was that he and appellant met at Carr's place about 8:30, and after saying that he couldn't say what time appellant left,—he testified "I judge it must have been something like an hour and a half or two hours from the time he drove up there until he left." Carr testified that appellant was at his place an hour and a half or more,—that appellant left his place about 9:30 or 10:00 o'clock. Giving to the testimony of Carr full credence, appellant could have been at the scene of the killing by 9:45 or 10:00, driving around twenty miles per hour. Gaddis admitted that his was but a guess, but under his testimony, and driving at the same rate appellant could have been at his home by 10:15 or 10:45 that night.

Nothing in the testimony herein locates appellant from the times mentioned until he came down to Winn's house that night about fifteen or twenty minutes before 12:00 o'clock, according to Roy Works' testimony, to get the lights on his coupe fixed. According to Bush, the truck referred to came down from the direction of appellant's house fifteen or twenty minutes before appellant came down from the same direction without lights on his coupe.

In Underwood v. State, 55 Texas Crim. Rep., 601, discussing when a charge on alibi should and need not be given, Judge Ramsey used the following language: "We believe that the true distinction is laid down in the case of Parker v. State, 40 Texas Crim. Rep., 119, 49 S. W., Rep. 80, where it is held, in effect, that unless the testimony fails to exclude the idea of his presence at the homicide a charge upon the subject of alibi need not be given. In no case should a cause be reversed for the refusal of such a charge unless in the light of all the testimony the evidence excludes the theory of appellant's presence at the place of the crime."

This is expressly quoted and approved in Woods v. State, 80 Texas Crim. Rep., 74, citing Parker v. State, 40 Texas Crim. Rep., 119; Hernandez v. State, 64 Texas Crim. Rep., 73; Myers v. State, 65 Texas Crim. Rep., 448. This language is also approved in Basham v. State, 118 Texas Crim. Rep., 33, wherein we said, in substance, as in our original opinion: "We do not understand that appellant's testimony as to his whereabouts is

inconsistent with the State's theory that he was present at the commission of the offense." In the case of Broz v. State, 93 Texas Crim. Rep., 140, discussing the failure of the court to charge on alibi, we said: "The law deals with substance, not with shadows, and, in order to entitle him to demand a charge presenting an issue, he must show facts to the court which substantially support the theory that, if his personal presence was not shown, he could not be guilty."

In this connection, our attention is attracted by the language of the charge in the instant case which instructs the jury in one paragraph that if they believe from the evidence beyond a reasonable doubt that appellant did kill Jack Sturdivant by shooting him with a gun, etc., to find him guilty; and again in another part of the charge submitting the case on the law of circumstantial evidence the court told the jury that the circumstances must be of a conclusive nature, producing in effect a reasonable and moral certainty that the accused committed the offense, and that same are not sufficient unless they exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt. Again, in charging on the law of principals, the court told the jury in effect that even though the killing be done by another or others, if appellant was present, and knowing the unlawful intent of such other or others, aided by acts or encouraged by words or gestures the preson doing the killing, he would be guilty. In others words, while we recognize that the taking of an exception to the charge for its failure to submit the issue of alibi, as was done in this case, is sufficient to present the point, we are still of the opinion that under the facts of this case the failure to charge on alibi was not error.

We have examined with interest the cases cited in appellant's motion. In Arismendis v. State, 60 S. W., 47, appears the statement that the defense of alibi was the only one interposed in behalf of the accused, and that his testimony "Denies his presence and possession, and other evidence shows or tends to show that he was at a certain point in the city of Brownsville at the time." Certainly in such case a charge on alibi should have been given. In Sapp v. State, 77 S. W., 456, we find the case reversed for other reasons, but this court suggests that upon another trial it might be well to give a charge on alibi. It is not stated what the alibi evidence was. In Freeman v. State, 239 S. W., 969, there was positive testimony supporting the alibi relied on, and we said we could not see why the court did not submit the issue. When a witness or witnesses swear positively to an alibi, or to such state of facts as if true

are inconsistent with the presence of the accused at the place of the crime, the rule relegating to the jury and not the court the duty of passing on the weight of the evidence, has application.

The able efforts of appellant's counsel reflected by their brief, motion for rehearing and citation of cases from other jurisdictions, are most commendable. We are cited to Turner v. Commonwealth, 86 Pa. St., 54. In that case however a charge on alibi was given which the appellate court held bad. We agree. The trial court told the jury: "An alibi is a perfect defense when it is fully, clearly and satisfactorily established, but the burden is upon the person asserting it, to establish it." Other parts of the charge were assailed. Referring to the above, the appellate court said: "As an abstract proposition, the first part of this instruction might be regarded as correct, for, * * * as is said in Briceland v. Com., 24 P. F. Smith 463, per Agnew, J., when a defense rests upon proof of alibi, it must cover the time when the offense is shown to have been committed, so as to preclude the possibility of the prisoner's presence at the place of murder. It thus necessarily follows, that if the evidence on this point is imperfect, it comes to nothing."

We think this case against appellant's contention. We are also referred to West v. State, 48 Ind., 483, another case in which a charge on alibi was given, which the upper court held incorrect. In that case it was in testimony that the alleged crime was committed on a certain night, but no exact time was fixed therefor. The court held, in effect, that a charge that proof of alibi would have to cover the whole night, was good, but that so worded as to tell the jury that they must determine whether it was actually and physically impossible for the accused to be at both places, i. e. the place where he said he was, and the place of the murder,—was bad. That the use of the word "Impossible" was going too strong. The facts in the case are stated meagerly in the opinion. In Kaufman v. State, 49 Ind., 248, also cited by appellant, the testimony strongly supported an alibi, but left part of the night of the theft during which witness was asleep uncovered by testimony. The trial court gave a charge similar to that in the West case, supra, and the Supreme Court held it bad. Adams v. State, 10 So. Rep., 106, by the Supreme Court of Florida, is also cited; and a charge like that in the West case, supra, was there held bad, the court concluding that, while the alibi evidence might not show it impossible for the accused to have been at the scene of the crime,

same might have been enough to raise a reasonable doubt of his presence there.

Appellant urges that we misapprehended his contention in regard to proof made by the State as to the acts of O. D. Stevens prior to the alleged homicide. By exceptions to the court's charge complaint was made of the failure of said charge to tell the jury that acts and declarations of Stevens, not in the presence and hearing of appellant, could not be considered unless the jury found beyond a reasonable doubt that there was a conspiracy between appellant and Stevens to kill the deceased. Appellant also made a motion, which was presented in the form of a special charge, asking that the court strike out and instruct the jury not to consider "all the testimony pertaining to any acts or declarations" of said Stevens outside the presence and hearing of appellant, which was refused.

Much of appellant's motion for rehearing is devoted to claimed error in this regard. Appellant's bill of exceptions No. 1 sets out the refusal of said motion or special charge. We see no error in such refusal. In the ordinary development of a case such as this the names and acts of many different persons might appear, and it must be at once apparent that unless there be some legal reason therefor, no necessity would exist for such instruction. We have scrutinized again the record in the light of appellant's motion.

Granting that the record suggests that more than one person was implicated in the killing; that each of three men killed at apparently the same time, was shot with a different weapon; and that other facts in evidence were deemed sufficient to call for a charge on principals,—we would still be of opinion that unless the acts of Stevens, referred to in testimony, could be held in some way hurtful to the cause of appellant, there was no error in refusing said motion. In his motion appellant seems to concede that if the testimony had shown that the three men slain played dominoes with Smith, Brown or Jones in Handley that afternoon, the mention of such parties names in testimony might not have called for such charge, but because they were said to have played with Stevens, such charge should have been given. Likewise that if when Smith, Brown or Jones, who lived near appellant, got in their cars and started home, and the other parties got in their cars and followed, this would have called for no such charge. No declaration of Stevens was in evidence, as appears in the cases cited in the brief of appellant. Parties can be convicted as principals in criminal cases without testimony of conspiracy. There are facts, as above stated, in

this record which indicate an acting together of more than one person in this killing, which occurred in the vicinity of appellant's home and that of Stevens. The wire around the clothes and the bodies was said to be the same kind as that with which fences were built on both appellant and Stevens' places; the stone with which the clothes were weighted was similar to the stone on each of said places. The sound of the shooting that night came from the general direction of the May and Stevens' homes, but testimony of the use of Stevens name in such connection would seem not to add any criminating weight to the proof against this appellant. True, Routt said that he had a conversation with Stevens about the mail robbery in February, 1933, but said not one word about what was said in the conversation. Probably conversations were had between every citizen of Fort Worth and some other person about the same occurrence. How this could have injured appellant under this record is not perceived. Appellant admitted to Routt that he was implicated in said robbery, but said nothing of Stevens being in the same boat. The killing took place near appellant's house; he had told a witness that he might have to kill the parties who were slain; his truck was bloody the next day; wire like that on his fence was around the bodies and clothes; rocks like those on his place weighted down the garments; he came down the lane from the direction of his house that night soon after his truck passed about midnight; he was seen early the next morning in said car on said road; the burned cushion of his truck was discovered the day after the alleged homicide on his place.

If the State had not shown that wire like that on both places was around the bodies and garments, but that such wire was only like that on the fence of appellant, it would have been perfectly competent defensive testimony to prove that similar wire was on Stevens' fence. Likewise as to the rocks found with the garments. Appellant cites the case of Benavides v. State, 60 S. W. (2d) 436, in which the State proved that a party claimed to be an accomplice had said that the accused hired him to commit the crime. This was held inadmissible, and several cases cited in which reversals were ordered because efforts were shown to prove conspiracies by the declarations and acts of other parties when the accused was not present, with which cases on their facts we are in accord, but fail to see any application of either those authorities or that of Benavides v. State, supra.

Not being able to agree with appellant's contentions, the motion for rehearing is overruled.

*Overruled.*